# DECISIONS

OF THE

# Court of Appeals of Kentucky

## WINTER TERM, 1917

## Chesapeake & Ohio Railway Company v. Harmon's Administrator.

(Decided December 15, 1916.)

### Appeal from Floyd Circuit Court.

1. Master and Servant—One Riding Upon Engine While Learning Duties of Fireman—Employers' Liability Act—When One Ceases to be Employe Under.—One, who has been granted the privilege, by a railway carrier engaged in interstate commerce to ride upon the engines drawing its trains, to learn the duties of a fireman, is an employe of the carrier, within the meaning of the Federal Employers' Liability Act, while he is engaged in performing the duties, which are expected of him and within the scope of his employment, and his services are being accepted by the carrier, although he receives no wages for his services and may abandon his employment at any time, and the carrier may, at any time, withdraw its permission to ride upon its engines, but having no time fixed within which he will exercise his privilege, when he is not engaged in the duties expected of him, and not where his employment requires him to be, he ceases to be an employe within the meaning of that act.

2. Master and Servant—Employe of Carrier.—Before one becomes an employe of a railway carrier, the relation of master and servant must exist between him and the carrier.

3. Master and Servant—How Relation Based.—The relation of master and servant is based upon a contract, either express or implied.

4. Master and Servant—Federal Employers' Liability Act.—The Federal Employers' Liability Act deals only with the liability of a carrier engaged in interstate commerce for injuries sustained by employes, while engaged in such commerce.

5. Master and Servant—Liability of Carrier Engaged in Interstate Commerce.—The liability of a railway carrier engaged in interstate commerce to its employes engaged in such commerce is ᴵ based upon the duty ᴧf the carrier to furnish its employes reasonably safe places in which to perform the work required of them, and while they are in those places, wherein they must necessarily be in connection with their work, but this duty does not extend to a servant, when he is at a place where he is not required nor expected to be in the performance of his work, nor when he is not within the scope of his employment.

HARKINS & HARKINS, WORTHINGTON, COCHRAN & BROWN-ING and F. T. D. WALLACE for appellant.

MAY & MAY for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

This action was instituted, under the Federal Employers' Liability Act, by the administrator of the estate of Mack Harmon, deceased, against the Chesapeake & Ohio Railway Company to recover the damages suffered by the estate of Harmon on account of his death, which it was alleged was caused by the negligence of the employees of the appellant, railroad company. At the time of his death, the decedent was riding in the caboose of a freight train of the appellant, which was called train No. 81, and consisted of forty-eight cars and was proceeding from Shelby, Kentucky, to Russell, over appellant's track. Just as this train was passing over Burnaugh's Hill, another freight train of the appellant, known as train No. 83, which was proceeding in the same direction, overtook and collided with the rear of train No. 81; crushed into pieces the caboose, and instantly killed the decedent. The action for damages was based upon the allegations that the appellant was engaged in interstate commerce, and that decedent was an employee of the appellant, and, also engaged in appellant's business of interstate commerce at the time of his death, and that the proximate cause of his death was the negligence of appellant's servants, in negligently permitting and causing the collision of the trains. The appellant, by its answer, denied that it was engaged in interstate commerce, at the time and place of the injury, to decedent, and, further denied, that decedent was an employee of it, or was engaged in assisting it in interstate commerce, and that his death arose from a risk, which he assumed, and further, that he was con-

tributorily negligent. The affirmative averments of the answer were denied by a reply. The trial in the Floyd circuit court resulted in a verdict of the jury and a judgment of the court in favor of the appellee. The appellant filed grounds for a new trial and entered a motion to set aside the verdict of the jury and judgment of the court, but its motion was overruled and hence this appeal.

It seems to be conceded, that each of the trains and the crews, in charge of them, were, at the time of the collision, engaged in interstate commerce, and that the collision was caused by the negligence of one or both of the crews of the trains, but it is seriously insisted for the appellant, that the decedent, at the time of his death, was not an employee of it and was not engaged in interstate commerce, and that, if he was an employee, he was not, at the time of his death, engaged in any duty, which was within the scope of his employment; that it owed him no duty at the time and place of his death, and hence, the court should have sustained its motion made at the conclusion of all of the evidence to direct a verdict in its favor.

The act of Congress, under which the action was instituted, deals only with the liability of a railroad engaged in interstate commerce for injuries sustained by its employees while, also, engaged in such commerce. It has no application to an employee, who incurs an injury, while not engaged in interstate commerce, or an injury incurred by a person, who is not an employee of a railroad company at the time. The admitted facts and such as are proven by the uncontradicted evidence, upon which it must be determined, as a matter of law, whether the decedent was an employee of appellant within the meaning of the Federal Employers' Liability Act, are substantially as follows:

The decedent resided at Prestonsburg, and in December, 1913, was employed by appellant as an engine watchman. After continuing in that service, for a short time, at Prestonsburg, he had employment of the same kind for some time and up to about the 28th day of May, 1914, upon the Elkhorn & Beaver Valley Railroad. There is a disagreement between the parties as to whether his employment upon the latter road was really a continuance of the employment by appellant, or whether the Elkhorn & Beaver Valley Railroad was an independent road, and the employment by it, was, as it

was pretended to be; but whether it was the one or the other is not material, since, on account of his services not being further needed, his employment, as engine watchman, came to an end on the 28th day of May, 1914, and he ceased to be employed in any way by either of the railroads. In the latter part of May he approached the train master and road foreman of engines of appellant, with a request for permission to go upon the trains of appellant and learn the duties of a fireman of locomotives, and to qualify himself for services of that kind, so. that in the future, if his services were needed, he could be able to secure a place of that kind. He informed this official, that he had been engaged for some time, theretofore, as an engine watchman, under the directions of one Mr. Allen, who had some kind of. connection with the Elkhorn & Beaver Valley Railroad, but that he had lost that position on account of his services being no longer needed. He was then informed, that it would be necessary for him to secure a letter of recommendation from Allen, which he said he felt he would be able to do. The train master and road foreman of engines, according to his statement, conveyed a direction to the general foreman of the motor power department of appellant, at Russell, to give decedent a "permit" to learn the duties of a fireman upon the Big Sandy division of appellant's road. The decedent secured the requested letter from Allen on the 28th day of May, but, it does not appear, that he secured the "permit" from Butler, the general foreman of the motor power department of appellant, at Russell, until the 4th day of June, which authorized him to ride upon the locomotive engines of appellant with the engineers and firemen and learn the duties of a fireman. There seems to be something, which is unexplained about the "permit," which the decedent had, as the train master seems to be under the impression that Butler gave the decedent a "permit" about the time decedent first approached the train master on the subject, as he says, that thereafter the decedent approached him again on the 31st day of May, according to his recollection, and informed him that he had secured the endorsement of two engineers upon his "permit," but had lost it or mislaid it, and the train master then informed decedent that it would be necessary for him to preserve his "permit" and to secure the endorsement of three engineers upon it and return it to him before he

would be authorized to consider an application for a position from him, and that Butler was directed to give decedent a "permit" in lieu of the former one, but Butler is emphatic in the declaration, that he gave decedent but one "permit," which was the one exhibited on the trial and bears the date of June 4th. The widow of decedent gave testimony to the effect, that on the night of the 28th of May he was awakened after he had retired for the night by some one, whom, she said was a brakeman, who requested him to come at once and assist them, as they had a "double header" and wanted to reach some point, which she did not remember, before the arrival of some other train, and that decedent immediately arose and went toward a train, which was then at Prestonsburg, and did not return to his home until the following Tuesday morning, about four o'clock, and that he was covered with coal dirt and appeared to have been working; that he remained at home on Tuesday and left again upon the engine of a train and did not return until Thursday evening, when he remained but a short time and went away. As to what decedent was doing between the Thursday night, when he was called from his home, and the following Thursday evening, when he returned on a train, is not material, as he, on Thursday, June 4th, on the evening of which he returned to his home at Prestonsburg upon the train, had secured the "permit," which is exhibited, in the evidence, and there is no pretense that he was on the trains under any other kind of arrangement than the one indicated, to learn the duties of a fireman. On Thursday afternoon, when train No. 81, which was proceeding from Shelby to Russell, arrived at Woods, which is a station between Prestonsburg and Shelby, an engine, with a caboose attached, arrived from in the direction of Prestonsburg. Decedent was riding in the engine cab with the engineer. When train No. 81 had arrived within a few miles of Prestonsburg, the decedent came over the train, from towards its rear, to the engine and got upon the engine, where he exhibited the "permit," which Butler had given him that day, to the engineer, and thereupon the engineer directed the fireman to stand aside and to permit the decedent to act as fireman, which he did until the arrival of the train at Prestonsburg. The train remained at that point for about one hour, during which the boiler was filled with water, the engine inspected, and the ash pan cleaned

out by the regular fireman. Decedent said to the engineer, that he would go to his home, which was nearby, and secure some clothing, and that if the train pulled out before his return, that he would catch on to the caboose and then come on to the engine along the train and perform the duties of fireman. The conductor testified, that just before the train proceeded on its way, decedent returned and entered the caboose; that the engineer had requested him to tell the decedent to come and ride upon the engine and assist the fireman, and that he delivered the message, but that decedent said that he had "fired" an engine from Russell that evening and was tired and would rest a while; that he urged decedent to leave the caboose, and said to him that he had no right to permit him to ride in it, but the decedent declined and exhibited his "permit," but the conductor told him, that it did not authorize him or permit him to ride in the caboose, but that he must go and ride upon the engine. The decedent, however, remained in the caboose and when the train arrived at Paintsville, the engineer again requested the conductor to tell the decedent to come and assist in "firing" the engine; that he delivered the message to decedent and again requested him to leave the caboose, but the decedent declined to do so, but said that he would go to the engine when the train arrived at Richardson. The train thereafter stopped at Richardson and at Chapman and, also, at Torchlight, at each of which places the conductor testifies that he requested the decedent to leave the caboose and go to the engine, and upon one of the occasions said to him, that he could never learn the duties of a fireman by riding in the caboose, and that at one of these places the engineer again sent a message to decedent to come on over to the engine. The decedent remained until the next stop, which the train made at Catalpa. The fireman was very tired and somewhat exhausted by this time and the engineer again requested decedent to come and assist. The message to him from the engineer was again conveyed by the conductor. The engineer corroborates the conductor in these statements. The decedent did not make any motion to go to the engine, until after the train was proceeding from Catalpa, when the conductor advised him, that because of the darkness, it was not safe for him to undertake to go over the train to the engine with the train moving as it was. After leaving that point and as the train had

arrived at the top of Burnaugh Hill, the conductor and rear brakeman, who were in the caboose, discovered that the engine of train No. 83 was dangerously near and approaching very rapidly, and the certainty of a collision seemed to be imminent. The decedent was lying asleep in the caboose, when the brakeman cried out to him, that the approaching train was going to run into the caboose, and lighted a fuse as a warning to the approaching train; the conductor then ran to decedent and awakened him, but the danger was then imminent and the conductor and brakeman jumped off from the caboose and saved themselves, while the engineer, fireman and front brakeman on train No. 83, sprang down from the engine of their train, just before it struck the caboose, with the result above mentioned. It should be, also, stated, that it was proven by another witness, that just as train No. 81 was leaving Prestonsburg, the decedent was seen standing upon a coal car in the train, with his face in the direction of the engine. This witness, also, stated, that shortly after the train had arrived at Prestonsburg, he saw the decedent upon the engine and engaged in throwing coal into it, while another witness, who says he was in company with the last mentioned witness, testified that as the train was leaving Prestonsburg, he saw the decedent engaged in putting coal into the engine, but the engineer, fireman and front brakeman upon the train all testify that they did not see the decedent, and that he was not upon the engine, at any time, after the train had arrived at Prestonsburg, and in this statement, they are corroborated by the conductor. The train left Prestonsburg about 7 o'clock p. m., and the collision occurred, at about 3 o'clock, on the next morning, and there is no disagreement, in the evidence, as to the fact, that decedent was never upon the engine, at any time, after the train left Prestonsburg. The engineer, fireman and front brakeman on train No. 81 escaped unhurt from the effects of the collision, and in fact the collision affected the engine, upon which, they were riding, so slightly, that they did not know until they had received information of it, what had happened, or that a collision had occurred at the rear of the train. It is apparent, that if the decedent had been upon the engine, where he was authorized to ride, that he would have escaped from the effects of the collision unharmed. All the testimony was to the effect that decedent was occupying the position, which

is called in the railroader's parlance, a "student" fireman; that he received no wages or return for his services, except the information, which would enable him to perform the duties of a fireman; that the "permit" authorized him to ride upon the engine of the train and at no other place; that while upon the train he was under the direction of the engineer; that no promise of employment was made him; that the railroad company kept the names of such persons as had received the endorsement of three engineers, as fit persons to be employed as fireman, for future reference, in the selection and employment of firemen; that when a "student" fireman had secured the approval of three engineers, who would endorse him as apparently having the qualities necessary to make a fireman, after an examination by some superior official of the company and found to be acquainted with the duties of the position, his application for employment of that kind would be considered when a man was needed for such a place.

The "permit," which the decedent held and by virtue of which he was upon appellant's trains, was as follows, viz.:

"Russell, Ky., June 4, 1914.

"To M. C. Harmon:

"This will be your authority to learn the road on the Big Sandy division as fireman.

Yours truly,
" F. R. Butler,
General Foreman."

To be an employee of a railroad corporation, in the capacity of an operative, upon a train, it is apparent, that the relation of master and servant must exist between the company and the individual, who claims to be an employee. The relation of master and servant must be based upon a contract, either express or implied, and the terms and conditions, of the contract, must, in a large measure be looked to, to determine the duties, which each one owes to the other, so that it may be ascertained, what acts of the employer may or may not constitute negligence, as applied to the employee. It has been said that "various tests have been proposed for determining when the relation of master and servant exists, so as to render the master liable to indemnify the servant for personal injuries; but it is impossible to

lay down any definite and satisfactory rule applicable to all cases; and the question must be determined as it arises, upon the facts and circumstances of the particular case." 26 Cyc. 1083. When the terms of the arrangement, between appellant and decedent is looked to, it is apparent that it does not contain any obligation upon the decedent to ever go upon one of appellant's trains or engines, or to in any manner undertake to learn the duties of a fireman, and that no time is provided, within which, he may take advantage of the permission given to him, to ride upon the engines and receive information as to the duties of a fireman. He may take one trip, and never go upon another, or he may ride from one station to another, and there desist in his endeavors until another time, and if he resumes, he then may go upon some other train and in another direction. He is absolutely free to use his own pleasure, as to when and upon what train, and at what time or times, he will undertake to exercise the permission granted to him, or he may decline to ever exercise it, or he may commence to do so and desist at such time and place, as he may desire. It is, furthermore, apparent that the railroad company may, at any time, withdraw its permission to ride upon its engines or to receive information from its employees or experience in the duties of a fireman upon its trains. If he takes advantage of the permission granted him and learns the duties of a fireman and secures the endorsement of the three engineers, and takes successfully the examination upon the duties of a fireman, he is still free to refuse employment as a fireman, and the railroad company is free, never, to engage his services. While, however, he is exercising his privileges under the permission granted him and is performing the duties contemplated by the arrangement, the railroad company is accepting his services, and in consideration of same is giving him the knowledge and experience, which will fit him for the avocation of a fireman. What the "student" fireman is receiving and what the railroad company is receiving in return is valuable. While the "student" fireman is upon the engine and performing the duties contemplated by the arrangement, and within the scope of his duties under the arrangement the railroad company certainly owes to him the same duties it owes to the regularly employed fireman of an engine in his employment. Rief v. G. N. Ry. Co., 148 N. W. 309. The law makes him an employee

while engaged in the duties expected of him under the arrangement, and being accepted by appellant. It is the duty of the railroad company to furnish its servant with a reasonably safe place to perform the work required of him. He is, also, entitled to this duty from the master, while he has to be in places, which are incident to his work—that is such places at which he must necessarily be, in connection with his work. It has been held that the relation of master and servant, in so far as the duty to protect the employee is concerned, begins when the servant is necessarily on the premises of the master, in accordance with his contract of employment. North Carolina R. R. Co. v. Zachary, 232 U. S. 248; Gray v. C. & N. W. Ry. Co., 153 Wis. 636; Fletcher v. B. & O. R. R. Co., 168 U. S. 135; St. Louis, S. F. & T. R. Co. v. Seale, 229 U. S. 156. Under the arrangement between decedent and appellant, it was the duty of decedent, when undertaking to take advantage of the terms of his arrangement, to be upon the engine, and under the direction of the engineer. It is apparent that he could not perform any of the duties of his position while riding or sleeping in the caboose, at the farthest point upon a long train from the engine. He had a right, as before stated, to desist from his duties, at any time he chose, but he could not do so and insist upon riding upon a train, at a place where, under the scope of his employment, he had no right to be. The caboose was not a place where his duties necessarily required him to be in connection with the duties of his employment. If the uncontradicted evidence is to be believed, he, when he received his injuries, had for the time being, at least, abandoned and desisted from exercising the duties of his employment, as he had a right to do, and for his own wishes and convenience was at a place where his employment did not make it necessary for him to be, and was refusing to engage in the work contemplated by his arrangement, and, under the facts, was not at the time, an employee within the meaning of the act under which the appellee seeks a recovery and under the arrangement with the appellant. It could not be successfully contended, that even a regularly employed servant of a railway carrier, who received a regular wage for his services, but who received an injury from the negligence of the carrier, when he was not upon duty, and not engaged in any service for the carrier, and was not at a place where he had a right to be, or

where it was necessary for him to be in the performance of his duties when on duty, is an employee of the carrier, within the meaning of the Federal Employers' Liability Act. One of the reasons is obvious. The injured servant was not, at the time of his injury, engaged in interstate commerce. The duty of a railway carrier to provide a reasonably safe place for its servant to do the work required of him applies to every place where the employee must necessarily be in connection with the duties of his employment, but as was said in Hobb v. Great N. Ry. Co., 80 Wash. 678; 56 L. R. A. (N. S.), 503:

"But that duty is not incident to a place, where a servant is not required to be in the performance of his work. Nor does it cover the servant when he is not within the scope of his employment or doing some act which is not incident to his employment. This rule is sustained by all the authorities and the Federal act in no wise attempts to change it."

The same rule is upheld by the decisions of this court. L. N. R. R. Co. v. Hocker, 111 Ky. 707; L. & N. R. R. Co. v. Pendleton's Admr, 126 Ky. 605. Under the terms of the employment of decedent, he was a servant of appellant at the times he was engaged in its service, and in the performance of the duties, which he was, by the terms of the arrangement, expected to perform, and not when he was not engaged in such duties, and at a place entirely without the scope of his employment to be, and where no duty connected with his employment required him to be. There is no sufficient reason shown why he was refusing to perform the duties expected of him, except his own pleasure, and at the time of his injury and since the evening before, he had not been engaged in the service of appellant. For the reasons given, the court should have sustained the motion for a direct verdict made by appellant.

The instruction upon the measure of damages was erroneous, as held by the United States Supreme Court in C. & O. Ry. Co. v. Kelly, decided June 5th, 1916, but with the conclusion we have arrived at upon the main question in the case, as above expressed, it is not necessary to pass upon the other questions raised upon the motion for a new trial.

The judgment is therefore reversed and cause remanded for proceedings consistent with this opinion.